**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **THE NATIONAL RIFLE ASSOCIATION OF AMERICA, INC.,** | § | |
| *Plaintiff,* | § | |
| | § | |
| | § | |
| **vs.** | § | **CIVIL ACTION NO.  3:23-cv-1471** |
| | § | |
| **BUREAU OF ALCOHOL, TOBACCO,** | § | |
| **FIREARMS AND EXPLOSIVES, STEVEN** | § | |
| **DETTELBACH in his official capacity as** | § | |
| **Director of the Bureau of Alcohol Tobacco** | § | |
| **and Firearms, U.S. DEPARTMENT OF** | § | |
| **JUSTICE, and MERRICK GARLAND, in** | § | |
| **his official capacity as U.S. Attorney General** | § | |
| *Defendants.* | § | |

**THE NATIONAL RIFLE ASSOCIATION OF AMERICA'S
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiff National Rifle Association of America, Inc., (the "**NRA**" or "**Plaintiff**") by and through the undersigned counsel, files this Complaint against Bureau of Alcohol, Tobacco, Firearms and Explosives ("**ATF**"), U.S. Department of Justice ("**DOJ**"), Steven Dettelbach, and Merrick Garland, in their official capacities under which they are responsible for administering and enforcing federal firearms laws, including a Final Rule titled "Factoring Criteria for Firearms with Attached 'Stabilizing Braces,'" (ATF, DOJ, Dettelbach, and Garland collectively, "**Defendants**"). Plaintiff seeks a declaration that Final Rule violates the Administrative Procedure Act and the Second and Fifth Amendments to the United States Constitution. Plaintiff also seeks preliminary and permanent injunctive relief barring Defendants from enforcing the Final Rule. In support of the Complaint against Defendants, Plaintiff hereby makes the following allegations.

# I.
## INTRODUCTION

**A.**    **The ATF Reverses Years Of Precedent In Promulgating The Final Rule.**

1.    The Bureau of Alcohol, Tobacco, Firearms and Explosives ("**ATF**") has allowed the general public to attach certain devices, commonly known as stabilizing braces, to pistols and other firearms. Stabilizing braces are designed to enable gun owners to operate certain firearms with one hand with more stability. Since 2012, the ATF consistently released letter rulings that reassured manufacturers and the public that attaching a stabilizing brace would not change the legal classification of a pistol or any other firearm as defined by statutes and regulations.

2.    As recently as December 2020, ATF reiterated this position and confirmed that there are legitimate uses for stabilizing braces. 85 Fed. Reg. 82516 (Dec. 18, 2020). Consequently, millions of law-abiding Americans, including members of the NRA, have lawfully purchased stabilizing braces and pistols equipped with stabilizing braces.

3.    This changed, however, on January 31, 2023, when ATF of the U.S. Department of Justice issued a Final Rule titled "Factoring Criteria for Firearms with Attached 'Stabilizing Braces'" 88 Fed. Reg. 6,478 ("**Final Rule**"). The Final Rule vests ATF with unbounded discretion to regulate stabilizing braces. This comes at a severe detriment to the millions of Americans who relied on ATF's prior rulings and acquired lawful firearms equipped with stabilizing braces.

4.    The Final Rule arbitrarily reverses several years of settled administrative practice and by a stroke of a pen to redefines "pistols" with stabilizing braces as short-barreled "rifles" subject to the onerous licensing and taxation requirements of the National Firearms Act of 1934, as amended, codified at 26 U.S.C. § 5801, *et seq.* ("**NFA**"). 18 U.S.C. §921 (a)(8); 26 U.S.C. § 5845(a)(4). The new definition of "rifle" promulgated by the ATF now turns on an

incomprehensible six-factor test that is based on ultra-subjective criteria about a firearm's "likely use" and the parsing of marketing materials that a gun purchaser may never have even seen.

**B.    The NRA, Including Hundreds Of Thousands Of Members In Texas And Millions Nationwide, Face Irreparable Harm Due To The ATF's Arbitrary Policy Change Via The Final Rule.**

5.      Because of the Final Rule, the millions of Americans, including many of the nearly 350,000 NRA members in Texas and over four million members nationwide, who own a pistol and a stabilizing brace, regardless of style or caliber or type of brace, must either dispose of, alter, or register their firearms. Otherwise, they face the prospect of 10 years in prison, and large fines.

6.      The risks associated with the Final Rule and these potential penalties irreparably harm the NRA's members. In *Mock v. Garland*, the Fifth Circuit implicitly found irreparable harm arising from the Final Rule along with a likelihood of success on the merits in holding the plaintiffs before the court and their members should be protected from enforcement of the Final Rule and issuing a preliminary injunction. The NRA's members are similarly situated and face the same irreparable harm.

**C.    The NRA Seeks To Protect Its Members From The Enforcement Of The Final Rule.**

7.      Predictably, the arbitrary nature of the Final Rule and the clear infringement on the Second Amendment rights of law-abiding Americans led to numerous lawsuits challenges to the Final Rule. The NRA did not initially file its own lawsuit to avoid burdening the courts with litigation and in reliance on existing precedent indicating plaintiffs in the existing lawsuits would either lose (eliminating any need for the NRA to independently sue) or win by obtaining nationwide relief invalidating the Final Rule. In short, the NRA did not anticipate a court would hold the Final Rule could not be enforced as to some gun owners but could be enforced as to others, with the sole difference being whether those individual gun owners were before the court.

8.      When the Fifth Circuit did exactly that in *Mock*, the NRA sought to intervene in an existing challenge to the Final Rule,[1] again with the goal of reducing burden and expense for all by avoiding duplicative litigation. The *SAF* court denied the NRA's request to intervene on June 30, 2023, based on, among other things, the NRA's ability to file its own lawsuit—something defendants in *SAF* argued should preclude intervention.

9.      Because of the unexpected shift in precedent relating to the scope of protection from the Final Rule and the court's ruling in *SAF*, the NRA now files this suit seeking to obtain the same protections for its members that the Fifth Circuit in *Mock* and Judge Boyle in *SAF* have already found necessary to protect against enforcement of the Final Rule. The NRA brings this action on behalf of its over four million members seeking (1) a preliminary injunction prohibiting Defendants from enforcing the Final Rule against the NRA and its members, (2) an order under the Administrative Procedure Act ("**APA**") holding Defendants' actions unlawful and setting aside the Final Rule, along with its findings and conclusions, and (3) a declaratory judgment and permanent injunction prohibiting Defendants from enforcing the Final Rule against the NRA and its members.

**II.**
**JURISDICTION AND VENUE**

10.     The Court has jurisdiction over this action under 5 U.S.C. § 702 and 28 U.S.C. § 1331. This Court has authority to grant the remedy the NRA seeks under 28 U.S.C. §§ 2201 and 2202 and 5 U.S.C. § 706.

11.     Venue is proper in this district under 5 U.S.C. § 703 and 28 U.S.C. § 1391(e).

---

[1] The existing challenge is styled *Second Amendment Found., et al. v. Bureau of Alcohol, Tobacco, Firearms, and Explosives, et al.*, Civil Action No. 3:21-cv-0116-B, in the United States District Court for the Northern District of Texas, Dallas Division ("***SAF***").

### III.
### PARTIES

12.     The NRA is a nonprofit corporation organized under the laws of the State of New York with its principal place of business in Fairfax, Virginia. For many decades, it has been the largest and most effective guns rights lobbying organization in the country.

13.     The NRA is a traditional membership association and America's leading provider of gun-safety and marksmanship education for civilians and law enforcement. Representing more than four million members, the NRA is the foremost defender of the Second Amendment to the United States Constitution.

14.     The NRA was founded in 1871 by U.S. Army veterans Col. William C. Church and Gen. George Wingate to "promote and encourage rifle shooting on a scientific basis." In the following decades, the NRA has provided world-class firearms instruction to thousands of gun owners across the country. When anti-gun lobbyists and politicians began their war on the Second Amendment, the NRA fought back. And over the years, it has defeated hundreds of attempts on the national, state, and local levels to infringe on the Right to Keep and Bear Arms. Today, the NRA stands as America's oldest civil rights organization.

15.     The NRA is a traditional membership association. The NRA is an organization for all law-abiding gun owners – and serves people of all ages. Members can join via https://membership.nra.org/MultiStep/JoinToday and choose various membership tiers. Once they join, members have access to their choice of magazines, grassroots gatherings, and educational opportunities. They receive many other benefits, including discounts from NRA business partners and free admission to special events.

16.     The NRA's Board of Directors boasts members from all over the country. Many Board members are former elected representatives and are actively involved in the affairs of their

communities. Many are attorneys or grassroots activists who have advocated directly for the rights of gunowners. Many are former members of the military or law enforcement. They are in constant touch with members and make sure that the NRA's day-to-day operations are aligned with its mission of protecting law-abiding gun-owners and their communities. In sum, the NRA is a "membership organization" to its core.

17.     The millions of law-abiding NRA members across the nation rely on the NRA to protect their gun rights, including by pursuing litigation on behalf of its members to protect those rights.

18.     First among the "Purposes and Objectives" contained in the NRA's bylaws is "[t]o protect and defend the Constitution of the United States." The NRA is the foremost defender of the Second Amendment to the United States Constitution. The NRA's programs and outreach impact the lives of millions of law-abiding gun owners – around the United States and world. The NRA engages in extensive advocacy at all levels of government to promote the rights of its members and all Americans.

19.     The NRA spends tens of millions of dollars annually distributing pamphlets, fact sheets, articles, electronic materials, and other literature to advocate for its views on the Second Amendment and to assist NRA members engaging in national, state, and local firearm dialogue. The NRA's direct mail, television, radio, and digital communications seek to educate the public about issues bearing on the Second Amendment, protect its millions of law-abiding members against laws and regulations that would infringe their rights, and galvanize participation in the political process by NRA members and supporters.

20.     The NRA's legal, political and grassroots advocacy is particularly important in the State of Texas. Texas is home to approximately 350,000 members – the state ranks #1 for NRA

6

membership. Texas is one of the Top 10 "best states for gun owners."[2] Almost 50 percent of adults in Texas live in homes with guns.[3] According to industry reports, the state is reliant on the firearms industry, which, directly and indirectly, creates and sustains more than 30,000 jobs.[4] This industry is being irreparably threatened by the Final Rule.

21.     NRA members, including Dr. Carl Carlson, own and utilize firearms with attached stabilizing devices, and their freedom to do so is being hindered by the Final Rule.[5] The NRA's members and supporters include gun owners who purchase, transfer, possess, own, customize, accessorize, and utilize stabilizing braces and firearms equipped with stabilizing braces. NRA members, including Dr. Carlson, have relied on previous decisions that the attachment of a stabilizing brace does not automatically subject a firearm to regulation under the NFA.

22.     Preserving and safeguarding these rights and interests aligns with the mission of the NRA, which aims to uphold and protect the Second Amendment and the rights of Americans to possess firearms, particularly in the face of unwarranted intervention by unelected and unaccountable anti-firearm bureaucrats.

23.     Defendant U.S. Department of Justice ("**DOJ**") is an executive agency within the federal government of the United States. DOJ is headquartered at 950 Pennsylvania Avenue NW, Washington, D.C. 20530. DOJ is the agency responsible for enforcing federal firearms laws.

---

[2] Keith Wood, "The Best States for Gun Owners Ranked for 2022," *Guns & Ammo* (Aug. 18, 2022), available at https://www.gunsandammo.com/editorial/best-states-for-gun-owners-2022/463592.

[3] Jessica Learish & Elisha Fieldstadt, "Gun Map: Ownership by State," *CBS News* (April 14, 2022), available at https://www.cbsnews.com/pictures/gun-ownership-rates-by-state/.

[4] Lora Korpar, "Texas Tops in Creating Gun Company Jobs in 2021, California a Close Second," *Newsweek* (April 1, 2022), available at https://www.newsweek.com/texas-california-gun-firearm-jobs-output-1694315.

[5] *See* Declaration of Dr. Carl Carlson ("**Carlson Decl.**"), attached as **Exhibit A** (originally filed in *SAF*).

24.     Defendant Bureau of Alcohol, Tobacco, Firearms and Explosives ("**ATF**") is a component of the DOJ, and is headquartered at 99 New York Avenue NE, Washington, D.C. 20226. ATF is delegated authority to enforce federal gun control laws.[6]

25.     DOJ and ATF are collectively referred to herein as "**Agencies**."

26.     Defendant Merrick B. Garland is the Attorney General of the United States. He is vested with authority to enforce the Gun Control Act ("**GCA**"),[7] and the NFA. He is sued in his official capacity.

27.     Defendant Steven M. Dettelbach serves as the Director of ATF, and is responsible for overseeing the agency's promulgation of the Final Rule challenged herein. He is sued in his official capacity.

## IV.
## STANDING

28.     The NRA has associational standing to bring suit on behalf of its members because, "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim nor the relief requested requires the participation of individual members in the lawsuit."[8] For example NRA members in the Dallas Area, like Dr. Carlson, use pistols with attached stabilizing braces, and rely on stabilizing braces to use their firearms.[9]

29.     NRA members, like Dr. Carlson, rely on the NRA to protect them from the Final Rule by means of litigation, lobbying, and other advocacy efforts.

---

[6] *See* 28 U.S.C. § 599A; 28 C.F.R. § 0.130; 18 U.S.C. § 926(a).

[7] 18 U.S.C. §§ 921-31.

[8] Hunt v. Washington State Apple Advert. Comm'n, 432 U.S. 333, 343 (1977).

[9] *See* Carlson Decl., Ex. A.

30.     For example, on December 12, 2022, the NRA updated its members on the status of the Biden Administration's efforts to regulate pistol braces and promised, "Whatever develops on this front, you can count on NRA to remain involved, and to keep you updated."[10]

31.     The NRA has followed through on these promises, taking repeated steps to try to protect its members from the Final Rule.[11]

32.     For example, on September 8, 2021, the NRA filed public comments opposing the ATF's proposal to regulate stabilizing braces.[12] And then, the NRA successfully obtained clarification of multiple aspects of ATF's proposed rule before it went into effect, including (1) that braces removed from firearms do not necessarily have to be destroyed or altered in a way that prevents them from being reattached to a firearm; and (2) that imported pistols with stabilizing braces do not necessarily need to be destroyed or surrendered.[13]

33.     If the NRA does not obtain relief on behalf of its members, their constitutional and statutory rights will be significantly infringed. Among other things, they face the prospect of felony prosecution if the Final Rule is not enjoined. Accordingly, the NRA's members are firearms owners that face irreparable harm arising from the Final Rule.

34.     Courts have held that the NRA has a protectable interest relating to its interest in preventing the imposition of firearms restrictions on its members.[14]

---

[10] NRA-ILA, "Biden Administration Continues to Push to Target Firearms with Attached Stabilizing Braces" (Dec. 12, 2022); *available at* https://www.nraila.org/articles/20221212/biden-administration-continues-push-to-target-firearms-with-attached-stabilizing-braces.

[11] *Id.*

[12] NRA-ILA, "Comments of the National Rifle Association on ATF's Proposed Rule 2021R-08" (September 8, 2021) (the "**NRA Comments**"), attached as **Exhibit B**.

[13] NRA-ILA, "Updates to Final Rule on Stabilizing Braces" (Jan. 30, 2023); *available at* https://www.nraila.org/articles/20230130/updates-to-atf-final-rule-on-stabilizing-braces.

[14] Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt., 266 F.R.D. 369, 373 (D. Ariz. 2010).

## V.
## BACKGROUND

**A.     The NFA And The GCA.**

35.     The Government regulates firearms primarily through two federal statutes: the NFA and the GCA.

36.     The classification of firearms under these two statutes corresponds to the regulatory obligations they entail.

37.     Since the NFA specifically lists the "firearms" that fall under its jurisdiction, most guns, including rifles, shotguns, and pistols, are not subject to NFA regulations. However, those firearms that are regulated by the NFA must adhere to burdensome tax and registration requirements, which are enforced through criminal penalties.

38.     Firearms that fall within the NFA's jurisdiction are subject to substantially more regulation than those firearms that do not. Most notably, anyone wishing to acquire or make an NFA firearm must apply, register, and usually pay a making or transfer tax to possess those firearms.[15] Some of these firearms are also subject to additional regulation under the GCA. For example, owners of destructive devices, machineguns, short-barreled shotguns, or short-barreled rifles must generally receive approval from the Attorney General before transporting their firearms across state lines.[16]

39.     In addition to these federal requirements, some states apply additional regulations to NFA firearms, including complete bans. Thus, classification of certain firearms as regulated under the NFA may result in these firearms becoming contraband in some states.

---

[15] 26 U.S.C. §§ 5811, 5821, 5841.

[16] *See* 18 U.S.C. § 922(a)(4).

40.     The GCA oversees the general business activities related to importing, manufacturing, or dealing in firearms. Additionally, the GCA imposes stricter regulations on the transportation, sale, and delivery of "short-barreled rifles," "short-barreled shotguns," or "machineguns."[17]

41.     Short-barreled rifles also fall under the NFA's jurisdiction.  A weapon classified as a "firearm" under the NFA is subject to extensive federal regulation. The NFA encompasses various regulations, including the imposition of a $200 tax on the making (by one not licensed to engage in the business of manufacturing firearms), manufacture (by one engaged in the business of manufacturing firearms), and transfer of machineguns, suppressors, short-barreled rifles, short-barreled shotguns, and destructive devices.

42.     The NFA defines "firearm" to include, in relevant part, "a weapon made from a *rifle* if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 16 inches in length."[18] A "rifle" is "a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed cartridge to fire only a single projectile through a rifled bore for each single pull of the trigger, and shall include any such weapon which may be readily restored to fire a fixed cartridge."[19]

43.     ATF may not depart from this unambiguous definition. "When the words of a statute are unambiguous, then . . . 'judicial inquiry is complete.'"[20]

---

[17] 18 U.S.C. § 922(a)(4), (b)(4).

[18] 26 U.S.C. § 5845(a)(4) (emphasis added).

[19] 26 U.S.C. § 5845(c).

[20] *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 254 (1992) (citations omitted).

44.     The NFA also requires registration of all NFA firearms with the Secretary of Treasury, purportedly to monitor payment of the associated tax.

45.     Before the NFA was amended in 1968, if the possessor of an unregistered firearm applied to register the firearm, as required by the NFA, Treasury could supply information to State authorities about the registrant's possession of the firearm. State authorities could then use the information to prosecute the person whose possession violated State laws. In 1968, the Supreme Court held that the registration requirement imposed on the possessor of an unregistered firearm violated the possessor's right against self-incrimination under the Fifth Amendment of the U.S. Constitution.[21]

46.     In 1968, in response to *Haynes*, Congress amended the NFA and removed the mechanism for the owner of an unregistered and untaxed NFA firearm to legally register that firearm. Congress also enacted 26 U.S.C. § 5848, which prohibits the use of "information or evidence obtained from an application, registration, or records required to be submitted or retained" regarding the "filing of the application or registration" of the NFA firearm for purposes of prosecuting a violation prior to or concurrent with the filing.

47.     Initially, the drafters of the NFA had the intention to include pistols within the legislation. The original version of the NFA defined a "firearm" as any "pistol, revolver, shotgun with a barrel length shorter than sixteen inches, or any other concealable firearm, along with accessories like silencers or machine guns."[22]

---

[21] *See Haynes v. United States*, 390 U.S. 85 (1968).

[22] Oliver Krawczyk, Dangerous and Unusual: How an Expanding National Firearms Act Will Spell Its Own Demise, 127 Dick. L. Rev. 273, 278 (2022).

48.     The $200.00 tax imposed by the NFA on short-barreled rifles and shotguns was essentially a means to discourage or eliminate individuals who wanted to evade a potential pistol ban by modifying a rifle to a shorter length.

49.     Although pistols were eventually excluded from the NFA's final version, short-barreled rifles and firearms made from rifles were not removed and continue to be subject to taxation.

**B.     The ATF Repeatedly Holds That Stabilizing Braces Do Not Transform Pistols Into Rifles, Creating Substantial Reliance Interests.**

50.     Since 2012, ATF's longstanding policy has been clear: firearms with stabilizing braces are not intended to be fired from the shoulder, and attaching a brace to a handgun does not transform it into a rifle, or a short-barreled rifle if it is less than 26 inches overall or has a barrel less than 16 inches under the NFA.

51.     ATF has *repeatedly* recognized that stabilizing braces serve a legitimate function and the inclusion of a stabilizing brace on pistol or other firearm does not automatically subject that firearm to the provisions of the NFA. That's because stabilizing braces were first designed and intended to help disabled veterans fire large format pistols.[23] Pistol braces are orthotic devices that allow users to more safely and accurately fire handguns.[24]

52.     Pistol stabilizing braces were first developed by Army veteran Alex Bosco to help disabled combat veterans safely fire pistols, after observing a disabled veteran struggle to safely fire a pistol at a gun range.

---

[23] *See* SB Tactical, "Our History," *available at* https://www.sb-tactical.com/about/company/.

[24] Letter from Attorney General Patrick Morrissey to Kevin McCarthy re: ATF's final rule entitled "Factoring Criteria for Firearms With Attached 'Stabilizing Braces,'" (May 25, 2023), attached as **Exhibit C**.

53.     After testing his concept with disabled veterans, Bosco sought approval from the ATF. In response, in 2012, ATF determined that attaching the submitted "brace" to a firearm did not change the firearm's classification as a pistol and, therefore, did not subject it to NFA controls. In reliance on this guidance, Bosco co-founded SB Tactical with Grant Shaw and began making production prototypes for various types of rifles.

54.     Since then, ATF has approved multiple similar brace designs through classification letters. While these letters are not made public by ATF, the companies receiving them often share them with the public to educate customers and the industry about the referenced products. They are also final agency actions, reviewable by courts and are generally binding on parties.[25]

55.     ATF has repeatedly confirmed that the inclusion of a stabilizing brace on a firearm does not make that firearm designed to be fired from the shoulder and subject to the NFA. While there was a limited time between 2015 and 2017 where ATF claimed that using a stabilizing brace as a shoulder stock could "redesign" the firearm and create an NFA firearm, ATF has never taken the position that the mere inclusion of a stabilizing brace on a firearm makes it an NFA firearm.

56.     On November 26, 2012, ATF issued a classification letter stating that a pistol stabilizing brace designed for forearm insertion and additional support did not qualify as a stock, thus not converting a pistol into a regulated short-barreled rifle.

57.     Also on November 26, 2012, ATF issued a determination letter to Sig Sauer stating that attaching its pistol brace to an AR-type pistol's buffer tube would not change the firearm's classification from a pistol to a short-barreled rifle.

---

[25] *See Sig Sauer, Inc. v. Brandon*, 826 F.3d 598, 600 n.1 (1st Cir. 2016).

58.     On March 6, 2014, ATF sent a letter to the Greenwood, Colo. Police Department stating that firing a firearm from a specific position, such as placing the receiver extension of an AR-15 type pistol on the shoulder, does not alter the firearm's classification. ATF also confirmed that certain firearm accessories like the SIG Stability Brace did not constitute shoulder stocks and, therefore, using the brace improperly did not result in a design change under federal law.

59.     On October 28, 2014, ATF sent a letter to a manufacturer stating that a shotgun with a pistol brace attached was not considered a regulated firearm under the NFA if the SigTac SB15 pistol stabilizing brace was used as intended and not as a shoulder stock.

60.     On December 15, 2014, ATF issued a determination letter to the manufacturer of the "Blade AR Pistol Stabilizer" stating that attaching the blade-style brace to a pistol would not change the pistol's classification under the NFA, if the brace was used as originally intended and not as a shoulder stock.

61.     Some of ATF's letters issued between 2014 and 2017 addressed the possibility of using a stabilizing brace to fire from the shoulder. While ATF indicated that attaching these devices to pistols did not make them short-barreled rifles, ATF also indicated that individual use of the firearm could be considered to determine if there was an intent to design or redesign the firearm into a short-barreled rifle.

62.     On January 16, 2015, ATF issued an Open Letter clarifying that a pistol stabilizing brace, when used as designed and described in the November 26, 2012, classification letter, could be attached to a handgun without making it an NFA firearm. However, the Open Letter stated that using the brace as a shoulder stock would constitute a "redesign" of the handgun, as it changed its intended function. The Open Letter did not define "use as a shoulder stock."

15

63.     The 2015 ATF Open Letter created confusion regarding the legality of various techniques for handling a brace-equipped firearm, based on ATF's perception of the user's intent and the question of whether mere intent could be considered a "design or redesign" under the law.

64.     ATF's Open Letter in 2015, which claimed that shouldering a firearm with a stabilizing brace converted it into a short-barreled rifle, represented a significant departure from ATF's previous guidance.

65.     However, the ATF never communicated a policy stating that attaching an approved brace to a firearm would automatically convert it into an NFA-controlled short-barreled rifle.

66.     On December 22, 2015, the ATF issued a determination letter regarding a new design of brace, indicating that an adjustable brace known as a "PDW-style brace" could be used as a pistol stabilizing brace if certain modifications were made.

67.     On October 3, 2016, the ATF issued a determination letter to Gear Head Works, LLC, stating that their "Tailhook" model of brace, when attached to an AR-type pistol, would not change the classification of the pistol or allow it to be fired from the shoulder.

68.     On January 12, 2017, the ATF issued another determination letter to Gear Head Works, LLC, confirming that their second generation of the "Tailhook" brace, when attached to an AR-type pistol, would not alter the classification of the pistol or enable shoulder firing.

69.     However, on March 21, 2017, the ATF sent a letter to SB Tactical, LLC, announcing a reversal of its stance on firing braced firearms from the shoulder. The letter clarified that the mere act of shouldering a pistol with a brace does not constitute a "redesign" of the brace unless specific steps are taken to configure the device for shoulder use.

70.     In other words, the 2017 letter from the ATF retracted the 2015 Open Letter, which had suggested that shouldering a pistol with a brace made it an illegal short-barreled rifle. The SB Tactical Letter indicated that using the brace as a shoulder stock would not be considered a redesign unless additional actions were taken to configure the device for that purpose.

71.     However, the 2017 ATF letter did not provide a clear definition of "incidental, sporadic, or situational use," leaving brace owners uncertain about the extent to which shouldering their pistols would cross ATF's undisclosed threshold.

72.     On October 31, 2017, the ATF issued a determination letter regarding the "Shockwave Technologies Blade Pistol Stabilizer 2.0," which was similar in design to the brace mentioned in a previous letter from December 15, 2014. The ATF concluded that attaching the Shockwave Blade Pistol Stabilizer alone to an AR-type handgun as a forearm brace would not make it an NFA firearm. However, if the person using the firearm takes steps to configure the device as a shoulder stock and fires the firearm from the shoulder, it would be considered a redesign.

73.     On July 24, 2018, the ATF issued a determination letter to Trinity Force Corporation, a manufacturer of a similar brace design to the Shockwave brace. The letter stated that if the brace was used as intended to stabilize a handgun while shooting with a single hand and the distance from the trigger face to the rear of the device was less than 13 ½ inches, it would not be considered a shoulder stock and could be attached to a handgun without making it an NFA firearm.

74.     Throughout the past decade, the ATF has issued various classification letters, adjusting and sometimes reversing determinations. These letters demonstrate that the ATF has

repeatedly approved the sale of braces and braced pistols without indicating a need for registration or making simple possession a crime.

75.     Furthermore, despite the ATF's attempt in the Final Rule to distance itself from previous classifications or restrict them to specific sample firearms, this history of classifications contradicts that claim. Numerous ATF letters have established that adding a stabilizing brace to a pistol does not transform the firearm into a short-barreled rifle under the NFA.

76.     As a result of the ATF's consistent and longstanding history of classifying stabilizing braces as exempt from NFA registration, millions of law-abiding consumers have purchased or manufactured pistols with stabilizing braces, relying on these assurances.

77.     Millions of Americans already legally own pistols with stabilizing braces, purchased and manufactured in the years since they were invented and first approved by ATF in 2012. From 2012-2020, there were at least ten new additions to the pistol brace market.[26] Many companies like SB-Tactical started manufacturing and evolving pistol braces to adjust to the users' wants and needs.[27] These products were developed following the legal guidelines set forth by ATF in combination with industry leaders. The massive increase in the sales of pistol braces also saw an increase in the production of pistol caliber carbines, classified as pistols, that could accept braces.

78.     In a letter to Attorney General Merrick Garland, 48 senators wrote that "ATF's effective rescission in 2017 of its previous misapplication of the law, combined with its repeated letter rulings approving stabilizing braces, created a thriving market for these stabilizing braces.

---

[26] https://f5mfg.com/news/history-of-pistol-braces-with-the-changing-gun-laws-in-the-us/

[27] *Id*.

Millions of law-abiding Americans have purchased braces to add them to their own firearms, or purchased firearms with the braces already attached."[28]

79.     "Millions of law-abiding Americans use pistol braces, and many of those Americans rely on braces because they are disabled," noted Senator John Kennedy (R-LA).[29]

80.     Indeed, a 2021 Congressional Research Service report cites estimates of from 10 to 40 million pistol braces owned by Americans.[30]

81.     Accordingly, the Final Rule threatens to make felons out of millions of law-abiding gun owners.

## C.     The ATF Arbitrarily Changes Course And Seeks To Punish Law-Abiding Gun Owners, Especially Disabled Gun Owners Who Rely On Pistol Braces.

82.     After nearly a decade of having repeatedly approved the use of stabilizing braces on firearms, ATF first attempted to change policy in December of 2020, publishing a Notice of Proposed Rulemaking in the Federal Register entitled "Objective Factors for Classifying Weapons with 'Stabilizing Braces.'"[31]

83.     After receiving 70,000 public comments, mostly in opposition, and criticism from members of Congress, ATF withdrew the 2020 Notice.[32]

84.     To create what would become the Final Rule, the Agencies in June of 2021 again published a notice of proposed rulemaking titled "Factoring Criteria for Firearms with Attached

---

[28] Sen. Bill Cassidy, "Cassidy, McConnell, Colleagues Call on Biden Administration to Withdraw Gun Braces Ban" (June 25, 2021), *available at* https://www.cassidy.senate.gov/newsroom/press-releases/cassidy-mcconnell-colleagues-call-on-biden-administration-to-withdraw-gun-braces-ban.

[29] Sen. John Kennedy, "Kennedy, Marshall, Clyde introduce resolution to stop Biden admin from turning lawful gunowners into felons with pistol brace rule" (Mar. 15, 2023); *available at* https://www.kennedy.senate.gov/public/2023/3/kennedy-marshall-clyde-introduce-resolution-to-stop-biden-admin-from-turning-lawful-gunowners-into-felons-with-pistol-brace-rule.

[30] Congressional Research Service, "Handguns, Stabilizing Braces, and Related Components" (April 19, 2021), *available at* https://crsreports.congress.gov/product/pdf/IF/IF11763.

[31] 85 Fed. Reg. 82,516 (Dec. 18, 2020).

[32] *See* 85 Fed. Reg. 86,948 (Dec. 31, 2020).

"'Stabilizing Braces,'" 86 Fed. Reg. 30826 (June 10, 2021) (the "**Proposed Rule**"). The Proposed Rule inspired over 200,000 overwhelmingly negative comments, making it among the most opposed rules in Agency history.

85.     In a public comment, the NRA voiced its opposition.[33]

86.     The NRA explained that NRA members possess firearms with attached stabilizing braces, and their freedom to do so would be hindered by the Proposed Rule because it would subject nearly all configurations of those firearms to the taxation and registration requirements of the NFA.

87.     It explained that, for most of the last decade, the firearm industry, NRA members, and other American gun owners have relied on ATF's decisions that the attachment of a stabilizing brace does not automatically subject a firearm to regulation under the NFA. With the Proposed Rule, ATF sought to abandon this consistency and puts the millions of gun owners who have relied on its position in serious legal jeopardy.

88.     The Proposed Rule would have created a set of "factoring criteria" to determine whether certain firearms with attached stabilizing braces are or are not subject to regulation under the NFA. However, the approach taken by ATF with the Proposed Rule seemed to be an effort to categorically ban firearms with stabilizing braces rather than a legitimate attempt to provide clarity to regulated individuals and entities.

89.     Further, the Proposed Rule was hopelessly vague. It failed to explain when the new set of factors should be applied, uses factors that are extremely difficult to understand and subject to arbitrary application, doesn't adequately address effects on existing owners of brace-equipped firearms, and would result in taxation inconsistent with the applicable statutory framework.

---

[33] *See* NRA Comments, Ex. B.

90.    Rather than abandon its attempt to turn law-abiding gun owners into felons, the ATF pressed on with its unlawful attempt to transform "pistols" into "rifles" covered by the NFA, simply due to the addition of a stabilizing brace.

91.    On January 31, 2013, the Agencies committed the final agency action at issue by promulgating the Final Rule, Factoring Criteria for Firearms With Attached "Stabilizing Braces."[34] The rule amends 27 C.F.R. § 478.11 and 27 C.F.R. § 479.11, the regulations that define "rifle" for GCA and NFA purposes.

92.    Before the Agencies promulgated the Final Rule, the regulatory "rifle" definitions simply repeated the statutory definitions. Just like the GCA,[35] the Agencies in the prior version of 27 C.F.R. § 478.11 defined "rifle" as follows: "Rifle. A weapon designed or redesigned, made or remade, and intended to be fired from the shoulder, and designed or redesigned and made or remade to use the energy of an explosive to fire only a single projectile through a rifled bore for each single pull of the trigger."[36]

93.    And just like the NFA,[37] the Agencies in the prior version of 27 C.F.R. § 479.11 defined "rifle" as follows: "Rifle. A weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed cartridge to fire only a single projectile through a rifled bore for each single pull of the trigger, and shall include any such weapon which may be readily restored to fire a fixed cartridge."[38]

---

[34] 88 Fed. Reg. 6478, 6574 (Jan. 31, 2023).

[35] 18 U.S.C. § 921(a)(7).

[36] 27 C.F.R. § 478.11.

[37] 26 U.S.C. § 5845(c).

[38] 27 C.F.R. § 479.11.

94.     The Final Rule effects a sea change in the regulatory landscape. It expressly invalidates every prior arm brace classification that ATF had issued.[39]

95.     The Final Rule then overhauls the "rifle" definition of 27 C.F.R. § 478.11 and 27 C.F.R. § 479.11. It does so by adding (to the sentence mirroring the statutes) two new paragraphs and six subparagraphs:

> Rifle. A weapon designed or redesigned, made or remade, and intended to be fired from the shoulder, and designed or redesigned and made or remade to use the energy of an explosive to fire only a single projectile through a rifled bore for each single pull of the trigger.
>
> (1)     For purposes of this definition, the term "designed or redesigned, made or remade, and intended to be fired from the shoulder" shall include a weapon that is equipped with an accessory, component, or other rearward attachment (e.g., a "stabilizing brace") that provides surface area that allows the weapon to be fired from the shoulder, provided other factors, as described in paragraph (2), indicate that the weapon is designed, made, and intended to be fired from the shoulder.
>
> (2)     When a weapon provides surface area that allows the weapon to be fired from the shoulder, the following factors shall also be considered in determining whether the weapon is designed, made, and intended to be fired from the shoulder:
>
> > (i)     Whether the weapon has a weight or length consistent with the weight or length of similarly designed rifles;
> >
> > (ii)    Whether the weapon has a length of pull, measured from the center of the trigger to the center of the shoulder stock or other rearward accessory, component or attachment (including an adjustable or telescoping attachment with the ability to lock into various positions along a buffer tube, receiver extension, or other attachment method), that is consistent with similarly designed rifles;
> >
> > (iii)   Whether the weapon is equipped with sights or a scope with eye relief that require the weapon to be fired from the shoulder in order to be used as designed;
> >
> > (iv)    Whether the surface area that allows the weapon to be fired from the shoulder is created by a buffer tube, receiver extension, or any other accessory, component, or other rearward attachment that is necessary for the cycle of operations;

---

[39] Final Rule, 88 Fed. Reg. at 6,480.

      (v)     The manufacturer's direct and indirect marketing and promotional materials indicating the intended use of the weapon; and

     (vi)    Information demonstrating the likely use of the weapon in the general community.[40]

96.     May 31, 2023, was the rule's "compliance date." Parties with a brace-equipped firearm had until then to either destroy it, permanently modify it, or surrender it.[41] But this is just an exercise of the Agencies' "enforcement discretion."[42] The Agencies nonetheless have announced that "the rule is immediately effective in that the Department may seek to enforce the NFA's requirements with respect to any new making or new transfer of a weapon with an attached 'stabilizing brace' that constitutes a short-barreled rifle under the NFA."[43]

97.     Moreover, ATF claimed it was promulgating an interpretive rule, so that it could take effect immediately.[44] But the Final Rule is clearly a legislative rule. In the simplest terms, an agency action that imposes new legally binding obligations that serve as the basis of enforcement actions is a legislative rule. An agency's interpretation of a prior regulation that does not impose new legal obligations or prohibitions is an interpretive rule.[45] The key factor is whether the agency is doing something new or explaining something that it did in the past.

98.     The Final Rule is unquestionably a legislative rule under any of the tests. It is being published in the Code of Federal Regulations, which makes it a legislative rule.[46] It is amending a prior legislative rule that is published in the Code of Federal Regulations, which makes it a

---

[40] Final Rule, 88 Fed. Reg. at 6574-75.

[41] *Id.* at 6480.

[42] *Id.* at 6480–81.

[43] *Id.* at 6481.

[44] *See* 5 U.S.C. 553(d)(2).

[45] *Nat'l Min. Ass'n v. McCarthy*, 758 F.3d 243, 251-52 (D.C. Cir. 2014).

[46] *Am. Min. Cong. v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1112 (D.C. Cir. 1993).

legislative rule.[47] The Agencies invoked their delegated rulemaking authority throughout the rule, which makes it a legislative rule.[48] Put simply, the Final Rule cannot be an interpretation of a prior regulation because the regulation is being amended—which means there is no prior regulation to interpret at the time of the rulemaking.

**D.**     **The NRA Relies On Existing Precedent In Not Filing An Independent Lawsuit, Immediately Seeks To Intervene In An Existing Lawsuit When Limited Relief Is Granted in *Mock*, And Files This Action Immediately After Being Denied Intervention.**

99.     One of the NRA's key missions is protecting its members' rights. And it does so throughout the country in a responsible and efficient manner. Thus, it relied on existing precedent in not initially filing its own lawsuit challenging the Final Rule.

100.     Earlier this year the Fifth Circuit reiterated "[t]he default rule is that vacatur is the appropriate remedy" in a challenge to a rule based on violations of the APA.[49] Indeed, Judge Kacsmaryk flatly rejected the proposition that the Final Rule could be "vacated" under the APA as to some parties but not others.[50] Based on the "default rule," the NRA expected any relief obtained by existing challenges to the Final Rule would adequately protect its members.

101.     The NRA's and Judge Kacsmaryk's expectations proved incorrect. In *Mock*, the Fifth Circuit held the Final Rule can be enforced as to some parties and not others in entering preliminary injunctive relief only as to the parties before the court. The *SAF* court relied on *Mock*

---

[47] *Id.*

[48] *Mendoza v. Perez*, 754 F.3d 1002, 1022 (D.C. Cir. 2014).

[49] *Cargill v. Garland*, 57 F.4th 447, 472 (5th Cir. 2023) (en banc).

[50] *Britto v. Bureau of Alcohol, Tobacco, Firearms and Explosives*, Civil Action No. 2:23-cv-019-Z (N.D. Tex. Apr. 14, 2023) (slip op.) at p. 10, n.1 ("vacatur leaves no rule (or provision) in place that to enforce against anyone").

to enter preliminary injunctive relief only as to the parties before the court in *SAF* shortly thereafter.[51]

102.    Within a week of learning its members would not be protected by the preliminary injunction granted solely to the parties before the court (and their members) in *SAF*, the NRA sought to intervene in *SAF*.[52] The intervention motion was also filed within months of the *SAF* plaintiffs filing the relevant complaint, within five months of the Final Rule's effective date (and within **a week** of the actual enforcement date).

103.    The *SAF* court denied the NRA's request to intervene on June 30, 2023, based in part on the NRA's ability to file its own separate lawsuit.[53] The NRA respectfully disagrees with the application of Fifth Circuit intervention law to its request to intervene and intends to appeal the ruling.

104.    The NRA nevertheless continues its ongoing and continuous efforts to protect its members from the Final Rule by filing the separate lawsuit the *SAF* court suggested was the proper approach. Providing protection to the NRA's members based on its associational standing is the most efficient course, because it avoids the need for millions of law-abiding gunowners to file their own challenges to the Final Rule.

---

[51] *See SAF*, (N.D. Tex. May 25, 2023), Doc. 62 at pp. 2-3; *SAF*, (N.D. Tex. May 31, 2023), Doc. 65 at pp. 2-3.

[52] *See SAF* at Doc. 69.

[53] *See SAF* at Doc. 85.

# VI.
## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### (VIOLATION OF APA 5 U.S.C. § 706(2)(A))

**ARBITRARY, CAPRICIOUS, ABUSE OF DISCRETION, NOT IN ACCORDANCE WITH LAW—UNEXPLAINED CHANGE IN POSITION/FAILURE TO CONSIDER RELIANCE INTERESTS**

105.     Plaintiff incorporates by reference all prior paragraphs of this Complaint and paragraphs in the counts below as though set forth fully herein.

106.     Under the APA, a court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law."[54]

107.     A court may hold that an agency action is arbitrary and capricious when the agency has failed to consider relevant evidence or articulate a satisfactory explanation for its action.

108.     In addition, an agency's departure from prior practice can serve as a basis for finding an agency's action to be arbitrary and capricious.

109.     The Final Rule is a clear change in position for ATF on stabilizing braces. Many designs that have been determined by the ATF to not be subject to the NFA in the past via private letter ruling will fail the factoring criteria.[55]

110.     "A central principle of administrative law is that, when an agency decides to depart from decades-long past practices and official policies, the agency must at a minimum acknowledge the change and offer a reasoned explanation for it."[56]

---

[54] 5 U.S.C. § 706(2)(A).

[55] *See, e.g.*, FTISB Letter 304,679 (Oct. 3, 2016) available at https://gearheadworks.com/wp-content/uploads/2018/12/Mod-2-Approval-Letter.pdf.

[56] *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 923 (D.C. Cir. 2017).

111.    There are four things that an agency must do when changing a policy under the APA: (1) the agency must show "awareness that it is changing [its] position"; (2) that "the new policy is permissible under the statute"; (3) that the agency "believes" the new policy is better; and (4) "good reasons" for the new policy.[57]

112.    In this case, ATF has dispensed with countless of its prior determinations and classifications, and adopted entirely new approaches and practices with respect to interpreting and applying the statutes it is tasked with enforcing.  ATF has failed to provide the required reasoned explanation for these sweeping and arbitrary policy shifts.

113.    In addition, an agency action may be "arbitrary and capricious" because it fails to account for the reliance interests of those affected by the action.[58]

114.    ATF has to provide more detailed explanations than it normally would because it changed factual findings (brace-equipped firearms are now intended to be shot from the shoulder) and many people relied on the prior position and bought braces. As the U.S. Supreme Court has held:

> the agency need not always provide a more detailed justification than what would suffice for a new policy created on a blank slate. Sometimes it must—when, for example, its new policy rests upon factual findings that contradict those which underlay its prior policy; or when its prior policy has engendered serious reliance interests that must be taken into account.[59]

115.    The Final Rule puts millions of otherwise law-abiding Americans in danger of federal criminal prosecution. Manufacturers, dealers, NRA members, and other firearm owners have all relied on ATF's past decisions on stabilizing braces when exercising their fundamental

---

[57] *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-16 (2009).

[58] *See Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1914-15 (2020).

[59] *Fox Television Stations, Inc.*, 556 U.S. at 515.

right to manufacture and own constitutionally protected arms. The Final Rule fails to address these interests entirely.

116.     ATF is "required to assess whether there [are] reliance interests, determine whether they [are] significant, and weigh any such interests against competing policy concerns.[60]

117.     Because ATF has failed to sufficiently address these interests in the Final Rule, it is arbitrary and capricious and violates the APA.

**SECOND CAUSE OF ACTION**
**(VIOLATION OF APA 5 U.S.C. § 706(2)(A), (C))**

**ARBITRARY, CAPRICIOUS, ABUSE OF DISCRETION, NOT IN ACCORDANCE WITH LAW—UNLAWFUL DEPARTURE FROM CLEAR STATUTORY TEXT / *ULTRA VIRES* AGENCY ACTION**

118.     Plaintiff incorporates by reference all prior paragraphs of this Complaint and paragraphs in the counts below as though set forth fully herein.

119.     The Final Rule conflicts with the plain text of the statutes it purports to interpret and implement, and therefore is not in accordance with law. Moreover, the Final Rule represents a conclusive agency action that exceeds its lawful authority and should be invalidated by the Court.

120.     Under the APA, a court shall "hold unlawful and set aside agency action, findings, and conclusions found to be … in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."[61]

121.     Defendants are only empowered to exercise the authority granted to them by statutes and are prohibited from enacting regulations to legislate and implement perceived intentions or purposes of Congress concerning federal gun control statutes.

---

[60] *Regents of the Univ. of Cal.*, 140 S. Ct. at 1915.

[61] 5 U.S.C. § 706(2)(C).

122.    The primary federal statutory law governing the potential application of the NFA to brace-equipped firearms is the definition of "rifle:" "The term 'rifle' means a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed cartridge to fire only a single projectile through a rifled bore for each single pull of the trigger, and shall include any such weapon which may be readily restored to fire a fixed cartridge."[62]

123.    Defendants may not depart from this unambiguous definition. "When the words of a statute are unambiguous, then … 'judicial inquiry is complete.'"[63]

124.    The pertinent part of the definition for brace-equipped pistols is whether they are "designed or redesigned, made or remade, and intended to be fired from the shoulder."[64]

125.    When read in context, it is clear that "intended to be fired from the shoulder" means the intent of the person who "designed or redesigned [or] made or remade" the firearm. "It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme."[65]

126.    With the Final Rule, ATF is seeking to expand the definition of "rifle" by amending the regulatory definitions of rifle to include "a weapon that is equipped with an accessory, component, or other rearward attachment (e.g., a 'stabilizing brace') that provides surface area that allows the weapon to be fired from the shoulder."

127.    While administrative agencies may be given some discretion when applying the statutes they are charged with enforcing, "[i]f the intent of Congress is clear, that is the end of the

---

[62] 26 U.S.C. § 5845(c).

[63] *Germain*, 503 U.S. at 254.

[64] 26 U.S.C. § 5845(c).

[65] *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989).

matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."[66]

128.    The same rule applies when Congress has provided a statutory definition for a particular term. "Such an explicit reference to a statutory definition demonstrates a Congressional intent to forestall interpretation of the term by an administrative agency and acts as a limitation on the agency's authority."[67]

129.    ATF cannot simply add to the clear and unambiguous definition of "rifle" provided by Congress. If an agency's regulation is not consistent with a statutory definition established by Congress, the agency has gone outside the bounds of its authority since it derives its authority from Congress.[68]

130.    The Final Rule unlawfully redefines "rifle" in contradiction of the NFA and GCA. The plain text of the NFA and GCA's statutory "rifle" definitions do not reach brace-equipped pistols.

131.    Pistol braces do not convert pistols into rifles under any reasonable reading of federal law. No good reason justifies subjecting pistols equipped with braces to the requirements of federal firearms laws for short-barreled rifles.

132.    In addition, to the extent there is any ambiguity regarding the statutory definition of "rifle," the rule of lenity eliminates that ambiguity. The rule of lenity applies here because the statutes at issue are at best grievously ambiguous as to whether the "rifle" definition can cover a

---

[66] *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984) (internal page numbers omitted).

[67] *Royce v. Hahn*, 151 F.3d 116, 123 (3d Cir. 1998).

[68] *See Peyton v. Reynolds Assocs.*, 955 F.2d 247, 251 (4th Cir. 1992) ("If a regulation reflects an administrative interpretation which is inconsistent with the plain language of the statute under which it is promulgated, we do not defer to the agency's interpretation.").

brace-equipped pistol; as a result, lenity dictates that Agencies and courts alike are bound to construe Congress's enactment as not extending so far.[69]

133.     Further, if an agency seeks to decide an issue of major national significance, its action must be supported by clear congressional authorization. "Under that doctrine's terms, administrative agencies must be able to point to clear congressional authorization when they claim the power to make decisions of vast economic and political significance."[70]

134.     Whether braced pistols are in fact short-barreled rifles is a question of major national significance, affecting a major segment of the economy and the rights of millions of gun owners. Neither the NFA nor the GCA's statutory definition of "rifle" resolves that question. Instead, it is one for Congress to address.

135.     Indeed, the Final Rule compels millions of gun owners to undergo a registration process for firearms they lawfully purchased, which were not subject to regulation or registration under the NFA at the time of purchase.

136.     The Final Rule requires the confiscation, destruction, or modification of all of the millions of legally-purchased firearms subject to registration where the owner does not wish to submit to registration.

137.     This will cause billions of dollars in economic damage or loss.

138.     The Final Rule expands the scope of federal crimes, potentially subjecting millions of otherwise law-abiding citizens to felony charges should they fail to comply with its provisions.

---

[69] *See Cargill*, 57 F.4th at 471.

[70] *W. Va. v. Envtl. Prot. Agency*, 142 S. Ct. 2587, 2616 (2022) (Gorsuch, J., concurring) (cleaned up).

139.     Congress did not authorize the ATF, nearly a century after the passage of the NFA and at least a decade after the permissive classification of stabilizing braces, to reverse longstanding policies, materially modify definitions, and reclassify millions of lawfully-purchased firearms to bring them under the control of the NFA.

140.     The combined and individual impacts of the Final Rule, as mentioned above, are too significant to have been authorized by Congress many years ago, only to be discovered and applied at this time.

141.     The Final Rule is in excess of the authority Congress granted ATF and is therefore in violation of the APA.[71] Article I, § 1 of the U.S. Constitution provides that, "[a]ll legislative powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives."

142.     Article I, § 7, Clause 2 of the U.S. Constitution mandates that, "[e]very Bill . . . shall have passed the House of Representatives and the Senate" and "shall . . . be presented to the President of the United States . . . before it become a Law . . . ."

143.     The Final Rule violates the Constitution by usurping legislative powers and violating Article I, §§ 1 and 7. Instead of relying on legislation, the Final Rule is an attempt by an administrative agency to alter the meaning of congressional enactments through bureaucratic fiat.

### THIRD CAUSE OF ACTION
### (VIOLATION OF APA 5 U.S.C. §§ 553 and 706(2)(A), (C), (D))
### ARBITRARY, CAPRICIOUS, ABUSE OF DISCRETION, NOT IN ACCORDANCE WITH LAW

144.     Plaintiff incorporates by reference all prior paragraphs of this Complaint and paragraphs in the counts below as though set forth fully herein.

---

[71] 5 U.S.C. § 706(2)(C).

145.    The APA at times requires that agencies engage in notice and comment rulemaking.[72]

146.    This requirement applies to the Final Rule.

147.    The Final Rule, however, did not abide by this requirement, as its definition of "rifle" is not the "logical outgrowth" of the original definition from the agency's proposed rulemaking.

148.    In particular, the Agencies' abandonment of point-based factoring criteria in its Proposed Rule ("Worksheet 4999") in favor of six-factor "balancing" test in its Final Rule violates the APA's requirement that notice be given of a proposed regulation's substance so that the public may comment on the proposal. An agency's "notice must adequately frame the subjects for discussion such that the affected party should have anticipated the agency's final course in light of the initial notice."[73]

149.    Here, nothing in the Proposed Rule or the Agencies' accompanying explanation thereof "gave [any] indication that [the agency] was contemplating a potential change" as drastic as scrapping the entire point-based worksheet regime that formed the centerpiece of the Proposed Rule.[74]

150.    On the contrary, the Proposed Rule explained that "[t]he ATF Worksheet 4999 is *necessary* to enforce the law consistently, considering the diversity of firearm designs and configurations.'"[75] Having read such language in the Agencies' Proposed Rule, commenters could not have reasonably foreseen that the Final Rule would adopt what appears to be a balancing-type test based on six factors that, if anything, are more subjective than those of the

---

[72] 5 U.S.C. § 553(b).

[73] *Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 447 (5th Cir. 2021) (cleaned up).

[74] *See Mid Continent Nail Corp. v. United States*, 846 F.3d 1364, 1376 (Fed. Cir. 2017).

[75] Proposed Rule at 30,826–01, 30,829 (emphasis added).

Worksheet—such as "whether the weapon has a weight or length consistent with the weight or length of similarly designed rifles," "whether the weapon has a length of pull . . . that is consistent with similarly designed rifles," "the manufacturer's direct and indirect marketing and promotional materials indicating the intended use of the weapon," and "information demonstrating the likely use of the weapon in the general community."[76]

151.    Moreover, in the section of the Proposed Rule entitled, "Comments Sought," the Agencies gave no hint that it might abandon Worksheet 4999, or the worksheet approach entirely; indeed, the word "worksheet" did not appear in that section. The closest this section of the Proposed Rule came to addressing the issue was in asking for comments on whether "ATF [had] selected the most appropriate criteria for determining whether a stabilizing brace has made a firearm subject to the NFA," and whether "commenters ha[d] additional criteria that should be considered."[77] These issues are quite different from that of whether the Worksheet system should be scrapped altogether. Realistically, there was "no way that commenters here could have anticipated which particular aspects of [the Agencies'] proposal were open for consideration."[78]

152.    Further reinforcing the point that the Agencies' Proposed Rule differed substantially from its Final Rule, the Agencies more than doubled its estimate of the Rule's economic impact on affected societal groups (namely the manufacturers, dealers, and owners of firearms). The Proposed Rule estimated the cost of the rule over a ten-year period at $114.7 million at a 3% discount rate and $125.7 million at a 7% discount rate, see Proposed Rule at 30,826–01, 30,845 Tbl. 2; the explanation of the Final Rule, by contrast, put the corresponding figures at $242.4 million and $263.6 million, respectively, see Final Rule at 6,573, Tbl. 2. Such

---

[76] Final Rule at 6,480, 6,574–75.

[77] Proposed Rule at 30,826–01, 30,850.

[78] *See CSX Transp.*, 584 F.3d at 1082 (cleaned up).

a drastic change in the "estimated financial impact of [an agency's] proposal . . . supports [the] conclusion" that the Final Rule was not a logical outgrowth of the Proposed Rule.[79]

153.    The purpose of notice and comment rulemaking is to "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments…."[80]

154.    Plaintiff, along with tens of thousands of its members and supporters, submitted comments critical of the definition of "rifle" as originally proposed by ATF.

155.    By failing to provide the opportunity for comment on its most recent attempt to define "rifle" in the Final Rule, the agency has failed to consider all the relevant arguments and important aspects of the problem.

156.    The Final Rule thus violated 5 U.S.C. § 553 and § 706(2)(D).

## FOURTH CAUSE OF ACTION
## <u>(VIOLATION OF APA 5 U.S.C. § 706(2)(B), SECOND AMENDMENT)</u>
## CONTRARY TO CONSTITUTIONAL RIGHT, POWER, PRIVILEGE, OR IMMUNITY

157.    Plaintiff incorporates by reference all prior paragraphs of this Complaint and paragraphs in the counts below as though set forth fully herein.

158.    According to the APA, agency action must be invalidated if it is deemed "contrary to constitutional right, power, privilege, or immunity."[81]

159.    The Final Rule imposes regulations on items that Plaintiff argues are properly classified as handguns under the GCA, widely utilized by millions of Americans and lacking any

---

[79] *See Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1108 (D.C. Cir. 2014).
[80] 5 U.S.C. § 553(c).
[81] 5 U.S.C. § 706(2)(B).

historical precedent for registration and taxation by the government. "[T]he American people have considered the handgun to be the quintessential self-defense weapon."[82]

160.     Handguns, including both pistols and revolvers, are in wide use currently. Indeed, as of 2021, ATF reported that there were nearly 128 million handguns in the United States.[83]

161.     Further, there is no historical practice of regulating gunsmithing of personal firearms by private individuals for their own use.  Historically, individuals have been able to modify their pistols by changing sights, optics, grips, etc. without losing either GCA classification or Second Amendment protection.

162.     Indeed, federal courts have recognized that even firearm components and parts deserve Second Amendment protection. Recently, the Delaware District Court explained that pursuant to *Bruen*, for the Government to prevail on an argument that firearm components fall outside Second Amendment protection, it would have to demonstrate that "firearm components are 'not typically possessed by law-abiding citizens for lawful purposes,'" which it failed to do.[84]

163.     The Final Rule violates the Second Amendment's right to keep and bear arms and therefore should be invalidated under both the Second Amendment and the APA.

**FIFTH CAUSE OF ACTION**
**(VIOLATION OF APA 5 U.S.C. § 553(d)) AND FIFTH AMENDMENT)**
**VOID FOR VAGUENESS**

164.     Plaintiff incorporates by reference all prior paragraphs of this Complaint and paragraphs in the counts below as though set forth fully herein.

---

[82] *Dist. of Columbia v. Heller*, 554 U.S. 570, 629 (2008).

[83] https://www.atf.gov/firearms/docs/report/2021-firearms-commerce-report/download, at 1-6.

[84] *Rigby v. Jenning*s, No. 21-1523 (MN), 2022 U.S. Dist. LEXIS 172375, at *16 (D. Del. Sept. 23, 2022).

165. A law is void for vagueness when it "fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute."[85]

166. A statute is also vague if it is "so standardless that it invites arbitrary enforcement,"[86]—the "more important" vagueness standard.[87] A statute that "impermissibly delegates basic policy matters to policemen, judges and juries for resolution on an ad hoc and subjective basis," with attendant dangers of arbitrary and discriminatory application, violates the Fifth Amendment.[88]

167. The Final Rule adopts vague and arbitrary standards and tests that invite future arbitrary and capricious actions on the part of ATF. Put bluntly, the ATF's six-factor test is incomprehensible to the average gun owner.

168. Thus, the provisions within the Final Rule do not provide sufficient clarity to a person of ordinary intelligence as to which firearms are subject to registration and tax obligations, and which firearms are exempt.

169. The Final Rule is therefore void for vagueness, in violation of the APA and the Fifth Amendment.

## VII.
## PRAYER

**WHEREFORE**, Plaintiff prays that this Court grant the following relief:

(1) Declare that the Final Rule violates the APA as it is unlawful and an *ultra vires* agency action;

---

[85] *Papachristou v. City of Jacksonville*, 405 U.S. 156, 162 (1972) (quoting *United States v. Harris*, 347 U.S. 612, 617 (1954)).

[86] *Johnson v. United States*, 576 U.S. 591, 595 (2015).

[87] *Kolender v. Lawson*, 461 U.S. 352, 358 (1983).

[88] *Chatin v. Coombe*, 186 F.3d 82, 89 (2d Cir. 1999).

(2) Declare that the Final Rule violates the APA as it is "not in accordance with law";

(3) Declare that the Final Rule violates the APA as it is arbitrary and capricious;

(4) Declare that the Final Rule violates the APA as it is not the logical outgrowth of the Proposed Rule and does not abide by the requirements of the APA;

(5) Declare that the Final Rule violates the APA insofar as it is contrary to constitutional right, power, privilege, or immunity, including under the Second Amendment, the Fifth Amendment, and the major questions doctrine;

(6) Declare that the Final Rule violates the right to keep and bear arms protected by the Second Amendment;

(7) Declare that the Final Rule violates the Fifth Amendment's Due Process clause by being void for vagueness;

(8) Vacate, set aside and hold unlawful the Final Rule and any associated findings and conclusions, pursuant to the APA;

(9) Preliminarily and permanently enjoin Defendants and anyone acting in concert with them from enforcing the Final Rule or from taking any action inconsistent with the rescission of the Final Rule against the NRA and its members; and

(10) Grant any other additional relief as the Court deems just and proper, including any attorneys' fees, reasonable litigation costs, and disbursements incurred in this action.

Dated:  July 3, 2023

Respectfully submitted,

**BREWER, ATTORNEYS & COUNSELORS**

By:  */s/ William A. Brewer III*
     William A. Brewer III
       State Bar No. 02967035
       wab@brewerattorneys.com
     Matthew H. Davis
       State Bar No. 24069580
       mhd@brewerattorneys.com
     Noah Peters (*pro hac vice* forthcoming**)**
       nbp@brewerattorneys.com

     1717 Main Street, Suite 5900
     Dallas, TX 75201
     Telephone: (214) 653-4000
     Facsimile: (214) 653-1015

     **ATTORNEYS FOR PLAINTIFF
     THE NATIONAL RIFLE
     ASSOCIATION OF AMERICA**